# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STEVEN BEARD, individually and as the personal representative of THE ESTATE OF SUPAK BEARD, <br><br> Appellant, <br><br> v. <br><br> THE EVERETT CLINIC, PLLC; OPTUM CARE SERVICES COMPANY; OPTUM CARE, INC.; and SHAILA H. GALA, MD, <br><br> Respondents. | DIVISION ONE <br><br> No. 85208-6-I <br><br> PUBLISHED OPINION |

DWYER, J. — Steven Beard appeals from the judgment entered on his medical malpractice claims brought individually and on behalf of the estate of his deceased wife, Supak Beard,[1] against the Everett Clinic and rheumatologist Dr. Shaila Gala. He contends that the trial court erred by issuing two jury instructions: the "exercise of judgment" instruction and the "no guarantee-poor result" instruction. The issuance of the "exercise of judgment" instruction was improper, Beard avers, for three reasons: first, it was an improper comment on the evidence; second, insufficient testimony supported the issuance of the instruction; and, third, in conjunction with the other challenged instruction, the defense case was unfairly emphasized. Beard asserts that the issuance of the

[1] Supak Beard is the decedent and Steven Beard is her surviving spouse. Throughout the record, Supak Beard is referred to as "Supak." Steven Beard as plaintiff, is referenced as "Beard." For clarity and consistency with the record, this pattern will be followed herein.

"no guarantee-poor result" instruction was also improper for three reasons: first, it misstated the law; second, it constituted an improper comment on the evidence; and third, in conjunction with the other challenged instruction, it unfairly emphasized the defense case. We disagree and therefore affirm.

I

Supak Beard was born in Thailand. In 1991, Supak was diagnosed with lupus while she was still living in Thailand.[2] Lupus is an incurable and chronic disease that is often "quiescent," but can also cause flare-ups that range in severity from mild to life-threatening. Flares are often treated with the steroid prednisone. Supak began taking varying dosage levels of prednisone to manage her lupus in 1991.

Supak moved to Washington in 2007 and married Steven Beard. In December 2007, Supak began treatment with Dr. Shaila Gala and continued with her until Supak's death on March 24, 2018. Supak had been a registered nurse in Thailand and continued fulltime work as a nurse in Washington.

From 2007 to 2017, Supak had not required more than 10 milligrams of prednisone to manage her lupus flares. Since 2014, she had been routinely taking only 4 milligram doses. The pertinent events preceding her death occurred between November 2017 and March 2018.

On November 27, 2017, Supak visited Dr. Gala, complaining of joint pain in her left shoulder, right hand, and left knee. In July 2017, Supak had visited her family in Thailand. Dr. Gala concluded that Supak was suffering from a lupus

---

[2] At trial, expert witness Dr. Elizabeth Volkmann explained that Supak had what is known as systemic lupus erythematosus or SLE.

flare, likely resulting from stressors from travel and working overtime as a nurse, as was a usual pattern in her medical history. Dr. Gala injected Supak with prednisone. She also advised Supak to increase her oral dose of prednisone from 5 milligrams to 15 milligrams because, in the past, Supak's arthritis pain had resolved with increased doses.

Supak next saw Dr. Gala on January 4, 2018. Supak continued to suffer from pain in her shoulder. Accordingly, Dr. Gala advised her to increase the prednisone dosage to 20 milligrams. Additionally, she prescribed methotrexate, which is a lupus medication. Dr. Gala also recommended an MRI of her shoulder to see if there was a tear or another injury causing Supak's pain. Supak reported feeling better the next day.

Between January 4 and January 15, Supak self-tapered the prednisone, lowering her dosage, but her pain increased as a result. Because Supak worked as a trained nurse, Dr. Gala knew that she was able to monitor her body, report her symptoms, and know when to isolate at home.

On January 15, Supak returned to see Dr. Gala, complaining of severe wrist pain and hand swelling. Dr. Gala re-checked Supak's lab results and increased the methotrexate dosage. Dr. Gala also recommended that Supak increase the dosage of prednisone to 60 milligrams and she injected Supak's shoulder muscle with an additional 40 milligrams of prednisone.

The results of Supak's shoulder MRI indicated that Supak had inflammatory arthritis. Her lab results showed elevated liver function.[3] Dr. Gala asked her clinic staff to call Supak to inform her of these results and to tell her to stop taking the methotrexate because it could be causing her elevated liver enzymes. Dr. Gala suggested that Supak continue to take 60 milligrams of prednisone and advised her to schedule an interventional radiology appointment to assess her shoulder.

On January 31, Supak called the clinic seeking to cancel her February 15 appointment with Dr. Gala and reschedule it to March 1. Supak told the clinic staff that she was canceling the appointment because she was feeling better and planned to travel to Florida to see her family. Dr. Gala was reassured upon learning that Supak felt well enough to travel.

However, on February 5, Supak called Dr. Gala's office to report that she had been having a fever and chills for several days. Another rheumatologist, working the shift in place of Dr. Gala, advised Supak to be checked for infection. Supak went to an urgent care walk-in clinic. The physician who saw her ordered blood and urine cultures and a chest X-ray. The clinic physician noted that Supak had a fever, chills, and an elevated heart rate. Supak did not have a cough, runny nose, abdominal pain, or a change in her bowel behavior.

The radiologist who read Supak's X-ray on February 5 noted a mass or a lesion: an "abnormal band-like . . . increased density in the right lung apex." He

---

[3] "Elevated liver function" is another way to say that there is a high level of liver enzymes in an individual's blood. This blood test result ("liver panel") is often a sign of inflamed or damaged cells in the liver and may indicate liver disease.

reported that the opacity "may represent atelectasis or artifact and less likely pneumonia. Lungs otherwise appear clear." The radiologist recommended a follow-up X-ray or a CT scan for further assessment. Dr. Gala did not order another X-ray or a CT scan because she believed that the note suggesting follow-up imaging was directed at the ordering physician.

After Supak's February 5 urgent care visit, the physician called Dr. Gala's office to inform her of the results. The urgent care doctor, in consultation with the rheumatologist taking calls for Dr. Gala that day, planned to start Supak on a 10-day course of Levaquin (an antibiotic) right away to preemptively treat the possibility of infection. The next day, after starting antibiotics, Supak reported that the fever had gone away. Dr. Gala told Supak to call her if she had a return of symptoms.

On February 11 (the seventh of ten days of antibiotic administration), the walk-in clinic called Supak to check on her, and Supak reported that she still did not have a fever. The blood and urine results later came back negative for infection.

Supak took her week-long trip to visit her in-laws in Florida. When she returned from Florida on February 17, she resumed her usual fulltime work schedule as a nurse. Dr. Gala was reassured by these activities.

However, on March 1, Supak was again having recurrent fever, chills, and an elevated heart rate, so she returned to see Dr. Gala. At this visit, in addition to fever and chills, Supak's liver function tests showed elevated enzyme levels. Therefore, although Supak's exam was consistent with an arthritis flare, Dr. Gala

believed it prudent to submit blood and urine samples for a full evaluation.[4]  On

direct examination, Dr. Gala testified about her decisions:

> Q      . . . [W]hat did you tell Mrs. Beard at the close of this March 1st visit in terms of the overarching plan for her as of that point in time?
> A      That we are going to treat her lupus arthritis flare. We're also going to evaluate for the possibility of infection, given one day of fever, and that we needed to follow up on these elevated liver function tests.  And with the labs that I ordered on March 1st, those results guide me.  And if elevated, I would send her to gastroenterology . . . .
> Q      Before we see how that plan played out, Dr. Gala, if you, in another scenario, have a patient where you are acutely concerned about an infection for a patient, where do you refer that patient to if you think that you have an acute concern for infection in a patient?
> A      If there's an acute concern, then I would refer that patient to the ER if I was concerned of an active infection at that time.

Dr. Gala testified that she did not think that Supak required emergency

intervention on March 1.  In Supak's chart that day, Dr. Gala noted that she did

not understand the etiology or the source of the fever and, therefore, before

taking action, she wanted to receive the results of the lab tests.

On March 2, Supak called Dr. Gala to report that her fever had risen from

her previous visit.  Dr. Gala had not yet received the blood and urine test results

at this point.  She had, however, received some of the other test results and

"[c]reated a telephone encounter" (ordering her staff to call the patient) to let

Supak know that her liver tests remained elevated and that Dr. Gala was going to

---

[4] A urine or blood "culture" test checks the sample taken for germs that cause infections. A "culture" is the term for growing microorganisms such as bacteria in a laboratory setting. Physicians order a "culture" to identify the bacteria. A urine culture can identify kidney disease as well as diabetes and cancer.  A blood culture test can identify serious infections in lungs, kidneys, bowels, gallbladder, or heart valves.

put a "plan in place" whereby Supak would see a gastroenterologist to "facilitate . . . a workup of this." Dr. Gala also ordered an ultrasound of Supak's abdomen. Dr. Gala referred Supak to a gastroenterologist, Dr. Janet King. Dr. Gala explained that she did not think the referral was urgent, given Supak's recent test results. She did not inform Dr. King about possible infection because "[Dr. King] knows how to do her job as a gastroenterologist."

Supak's blood and urine tests came back negative, with no evidence of infection.

On March 5, Supak had blood in her stool. Dr. Gala ordered a stool pathogen panel to test Supak's stool for infection, ordered an ultrasound to look for the source of blood, and asked her medical assistant to ensure that Supak was going in to see the gastroenterologist.

On March 6, the results of the stool pathogen panel were negative.

On March 13, Supak was examined by Dr. King. At this appointment, Supak complained of abdominal pain. Dr. King conducted a liver function test and found that Supak had abnormal liver function. Dr. King noted that if Supak's liver function tests remained elevated and the lab work was nondiagnostic, she would then need a liver biopsy. Dr. King also recommended an endoscopy.[5] On March 19, Dr. King performed that procedure. The result was "normal."

On March 20, Supak returned to the urgent care walk-in clinic with abdominal pain, fever, and nausea. The attending doctor told Supak that she

---

[5] An endoscopy is a nonsurgical procedure during which a long flexible tube with a camera is inserted into the body through the mouth, throat, and esophagus. The scope enables the physicians to look inside a patient's stomach and upper gastrointestinal tract.

should not wait until her April 3 appointment with Dr. Gala and that Supak needed to see her before then.

Dr. Gala saw Supak two days later. Supak was still reporting abdominal pain, fever, and chills. Dr. Gala ordered a CT scan of Supak's chest, abdomen, and pelvis. At 6:00 p.m. that evening, the CT results showed that Supak had "mass like opacities of the right upper lobe and right perihilar region," and "multiple bilateral solid pulmonary nodules" (referenced in trial testimony as "[g]olf ball sized masses"). At approximately 8:30 p.m., Dr. Gala called Supak and told her to immediately go to the emergency room. Dr. Gala did not treat Supak after this.

Shortly after the phone call with Dr. Gala, Supak went to the Providence Regional Medical Center emergency room. The diagnoses were terminal ileitis,[6] free abdominal air, and severe sepsis.

Early the next morning, March 23, an X-ray was done on Supak's abdomen, revealing that she had a perforated bowel. Emergency surgery was performed, during which it was discovered that the perforation had allowed feces to enter her abdominal cavity. A surgeon operated on Supak to repair the perforation. During surgery, a virulent infection was also observed in the abdominal cavity. In a postmortem culture of the surgical specimen, the infection was identified as extrapulmonary tuberculosis of the abdomen.

---

[6] Terminal ileitis is the inflammation of the "terminal" or last end of the ileum or small intestine before it leads into the large intestine.

Supak never awoke from the surgery.  In the early morning hours of March 24, she died from a cardiac arrest, septic shock, organ failure, and a perforated bowel caused by intestinal tuberculosis.[7]

None of the doctors that Supak consulted during this three-month period (or before then) suspected that Supak had tuberculosis in addition to lupus.  It was only during surgery that an infection was discovered and it was only in postmortem review that physicians recognized that tuberculosis had contributed to her death.

In 2021, Stephen Beard filed a complaint against the Everett Clinic and Dr. Gala, alleging that the defendants failed to meet the standard of care expected of reasonable prudent health care providers similarly situated when Supak sought treatment beginning in January 2018.

On February 27, 2023 and before the commencement of trial, Beard's attorney submitted a memorandum opposing the issuance of the exercise of judgment and no guarantee-poor result jury instructions.

The trial commenced on March 6, 2023.  Beard's theory of the case was that Dr. Gala had not taken necessary actions, had not ordered essential tests, and had not made urgent specialist referrals that could have saved Supak's life. Beard contended that Dr. Gala failed to take these steps despite the warning

---

[7] During trial, expert witness Dr. Marcel Curlin explained that there are different types of tuberculosis.  The most common type is pulmonary, which is found inside the lungs and occurs in approximately 85 percent of tuberculosis cases in the United States.  Another type is extrapulmonary, which is when tuberculosis is found outside the lungs.  As will be later discussed, Dr. Curlin also testified that Supak's combination of symptoms was "rare-upon-rare."

9

signs of infection, thereby falling below the applicable standard of care and breaching her duty as a rheumatologist.

Dr. Gala's theory of the case was that Supak's condition was very rare and that the extrapulmonary intestinal tuberculosis and consequent bowel perforation were hidden and undetectable, despite Dr. Gala's careful multi-step approach to Supak's ongoing treatment. The defense asserted that Supak's death was unpredictable and tragic, but that Dr. Gala could not have detected Supak's rare condition, given the symptoms presented and test results available at the time. The defense further argued that Dr. Gala could not have reasonably suspected intestinal tuberculosis, which is an uncommon disease in the United States, and that she selected a course of treatment based on what she knew about Supak's medical condition, symptoms, and history.

During trial, rheumatologist Dr. Paul Brown, called by Beard, testified that Dr. Gala's treatment fell below the standard of care when she did not order an X-ray or CT scan on March 1 or March 2 and when Dr. Gala did not refer Supak to an infectious disease specialist. Dr. Brown testified that Dr. Gala's treatment fell below the standard of care when she doubled Supak's prednisone dosage and did not then call her daily to monitor her fever and other symptoms.

Dr. Elizabeth Volkmann, a rheumatologist called by Dr. Gala, testified that Dr. Gala had met the standard of care for a rheumatologist at each step of her treatment of Supak. Dr. Volkmann testified that any rheumatologist who is caring for a patient with a lupus flare is always concerned about infection and would start an evaluation by asking questions about the patient's present symptoms.

For example, Dr. Volkmann said, if the patient had a cough, physicians looked for an infection in the lungs, but if the patient's pain occurred during urination, physicians looked for an infection in the urine. Dr. Volkmann testified that "a really important principle that most rheumatologists know well" is to treat a patient like Supak for a potential lupus flare and infection at the same time. Dr. Volkmann explained:

> If you just focus on the lupus flare and don't give antibiotics, you'd be not treating the infection adequately. But if you only give the antibiotics and ignore the lupus flare, the patient's own immune system won't be able to function to fight infection.

During her testimony, Dr. Volkmann discussed the records of Supak's numerous visits with Dr. Gala from January to March 2018. Dr. Volkmann explained why Dr. Gala would have chosen to increase prednisone doses, prescribe antibiotics, add methotrexate, stop methotrexate, aspirate and analyze shoulder joint fluid, order tests, and refer patients to specialists or decide not to do so.

Dr. Volkmann explained the importance of blood and urine culture and stool pathogen tests to detect infection in lupus patients and why Dr. Gala ordered the tests. Dr. Volkmann explained that Dr. Gala referred Supak to the gastroenterologist in order to determine whether there were any liver abnormalities. Dr. Volkmann explained that Dr. Gala decided not to urgently refer Supak to an infectious disease specialist because Supak had only a low-grade fever with no other signs of infection.

During cross-examination, Dr. Volkmann explained that Dr. Gala may not have ordered a chest X-ray on March 1 in order to reduce Supak's exposure to

11

unnecessary radiation, especially since Supak did not have any respiratory symptoms. During further redirect examination, Dr. Volkmann testified that Dr. Gala had adequately investigated potential infections at all times in her care of Supak.

Dr. Volkmann testified in detail to the steps Dr. Gala took when treating Supak on March 1 and March 2, in regard to Supak's three main medical concerns: worsening arthritis pain, abnormalities in her liver tests, and fevers suggesting infection that could also be due to lupus flares. For each decision and action, Dr. Volkmann testified as to why she believed Dr. Gala met the standard of care.

Dr. Gala testified that she had been treating Supak for a decade and that she was familiar with Supak's medical history and her response to medications. With this information, Dr. Gala decided to increase Supak's prednisone dosage.

> It was reasonable. Mrs. Beard had an active arthritis disease. In order to quickly treat and control the inflammation that was involving multiple joints, we needed an agent that would improve the inflammation quickly, and that is prednisone. Other treatments that we have would take a long time before we could get control of the arthritis.

Dr. Gala testified to her reasons for deciding not to order a repeat chest X-ray on March 1:

> A  [Supak] received antibiotics in the February 5th visit. She responded, felt well. When called by the walk-in clinic, she felt well enough to travel, and so at that March 1st, 2018 visit, I felt that infection had resolved with the treatment instituted by the walk-in clinic.
> Q  With all of that information in mind, did you feel that repeat chest imaging, whether that's a chest X-ray or a CT, did you think that a repeat imaging study of the chest was indicated on March 1st?

A        I didn't think it was indicated, as she reported no cough, no shortness of breath.  Her lungs were clear on auscultation, or clear on exam.

Q        Did that mean in any way that you weren't interested in pursuing a workup for infection?

A        No.

Q        All right.  Did you, in fact, feel that a workup for infection for Mrs. Beard was indicated on March 1st?

A        I did.

Dr. Gala then testified that she made the decision to order blood and urine culture tests to identify possible infection, but that she also had to treat Supak's lupus flares and determine the cause of her elevated liver function tests:

A        On March 1st, I was thinking of the possibility it was related with her lupus flare but also concerned of the possibility of infection.

. . . .

A        So I was reassured by her history of no chest pain or shortness of breath or cough.  I was also reassured on examination of her lungs and her chest.  Her exam was consistent with an arthritis flare, but I did feel, with the one day of fever, that I needed to check blood and urine cultures for evaluation.

. . . .

Q        There was a third thing going on with Mrs. Beard that day.  We know she had a return of lupus flares.  We know she had a fever, but she also had some lab work that you noted to be elevated; is that right?

A        Yes.

Q        And what was that lab work that drew your attention?

A        Her liver function tests remain elevated.

Dr. Gala testified as to why she chose to suspend Supak's course of methotrexate and what information she hoped to gain after the gastroenterology referral.  Dr. Gala testified that she did not feel it necessary to alert Dr. King to the suspected infection, given Dr. King's gastroenterological expertise.  Dr. Gala also testified that she did not call in an infectious disease specialist because Supak's cultures had been negative for infection up to that date.

During trial, expert witnesses were also asked to testify about why the physicians treating Supak might not have identified her tuberculosis or, conversely, why they should have detected it before her death.

Radiologist Dr. Scott Williams was called by Beard. Dr. Williams testified that if the CT scan had been done in February or early March instead of late March, it was likely that the tuberculosis would have been detected at those earlier dates, because tuberculosis takes months to develop and is "insidious." Dr. Williams explained that tuberculosis is the "great masquerader" because it can look like a lot of different things, both in the lungs and in the abdomen.

Dr. Marcel Curlin, an infectious disease specialist, was called by the defense. During direct examination, Dr. Curlin testified:

> A    . . . Mrs. Beard had a really unusual, uncommon, and very unfortunate combination of medical conditions, and it really wouldn't have mattered if she had an infectious disease consultation with someone like me earlier in her course.
> Q    And when you say "it really wouldn't have mattered," is the ultimate question whether earlier intervention would have made a difference in Mrs. Beard's outcome?
> A    It would not have changed the outcome.

Dr. Curlin stated that tuberculosis was "relatively uncommon" in the United States. Dr. Curlin also testified that it was uncommon for a patient to develop a bowel perforation from intestinal tuberculosis. Dr. Curlin testified that Supak had likely suffered the perforation after her presentation to the emergency department on March 22.

Dr. Curlin further testified that Supak's underlying medical conditions along with intestinal tuberculosis reflected "rare-upon-rare" conditions.

14

After the close of the evidence, the attorneys and the court discussed the proposed jury instructions. Beard objected to issuing both the exercise of judgment instruction and the no guarantee-poor result instruction. Beard argued that the two instructions were discretionary and not mandatory. Beard contended that the instructions were slanted toward Dr. Gala's theory of the case and that they constituted a comment on the evidence.

Dr. Gala's attorney responded that the instructions "fit squarely within the claims and the defenses of this case." The defense further noted that

> [t]his entire case has been argued as being one where a doctor, which is the correct statement of the law, is not in a position to guarantee any result, and that it is important for the jury to understand the law, in fact, says as much.

Dr. Gala's attorney argued that the challenged instructions were further justified because Dr. Gala had made choices among competing therapeutic treatments and diagnoses and had considered risks and benefits of each. Therefore, it was asserted, issuing the instructions together was appropriate.

Beard's attorney argued that there was insufficient evidence that Dr. Gala had made a choice among competing therapeutic options. Referring to the Needham v. Dreyer[8] decision, he also argued that it was not enough for a doctor to say in court that there were options and that those options were considered, but that "[t]here has to be more. Just practicing medicine isn't enough to show there was a choice."

---

[8] 11 Wn. App. 2d 479, 454 P.3d 136 (2019).

The trial judge decided that, based on the evidence presented, and because the Supreme Court decision in <u>Fergen v. Sestero</u>[9] approved of both challenged instructions and approved of issuing them together, the challenged instructions would be issued.

The court then instructed the jury. The instructions included, in pertinent part, the following:

> The plaintiff has the burden of proving each of the following propositions:
> First, that the defendant Dr. Shaila Gala failed to follow the applicable standard of care and was therefore negligent;
> Second, that Supak Beard died; and
> Third, that the negligence of the defendant Dr. Shaila Gala was a proximate cause of the harms and losses alleged by the plaintiff.
> If you find from your consideration of all of the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendants.

Jury Instruction 6.

> A health care professional owes to the patient a duty to comply with the standard of care for one of the profession or class to which he or she belongs.
> Dr. Shaila Gala, who is a rheumatologist, has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent rheumatologist in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question.
> Failure to exercise such skill, care, and learning constitutes a breach of the standard of care and is negligence.
> The degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question.

Jury Instruction 7.

---

[9] 182 Wn.2d 794, 346 P.3d 708 (2015).

A physician does not guarantee the results of his or her care and treatment. A poor medical result is not, by itself, evidence of negligence.

Jury Instruction 9.

A physician is not liable for selecting one of two or alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment, the physician exercised reasonable care and skill within the standard of care the heath care provider was obliged to follow.

Jury Instruction 12.

The jury's verdicts were in favor of the defendants. Beard now appeals.

II

This appeal is centered on various challenges to two jury instructions. Thus, we begin by setting forth the legal principles applicable to our review of the two challenged instructions.

"Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." Fergen, 182 Wn.2d at 803. "The propriety of a jury instruction is governed by the facts of the particular case." Fergen, 182 Wn.2d at 803.

Whether to give a certain jury instruction is within a trial court's discretion and therefore is reviewed for abuse of discretion. Fergen, 182 Wn.2d at 802. "In reviewing jury instructions, the test is whether the instructions, as given, enabled a party to argue its theory of the case." Koppang v. Hudon, 36 Wn. App. 182, 187, 672 P.2d 1279 (1983). The adequacy of the trial court's instructions to the jury is evaluated by reviewing them as a whole. Petersen v. State, 100 Wn.2d

421, 432, 440, 671 P.2d 230 (1983). "The number and specific language of the instructions are matters left to the trial court's discretion." Petersen, 100 Wn.2d at 440.

Jury instructions are reviewed de novo for claimed errors of law. Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012). "An erroneous instruction is reversible error only if it prejudices a party." Anfinson, 174 Wn.2d at 860. "The party challenging an instruction bears the burden of establishing prejudice." Fergen, 182 Wn.2d at 803.

"If the instruction contains a clear misstatement of law, prejudice is presumed and is grounds for reversal unless it can be shown that the error was harmless." Fergen, 182 Wn.2d at 803; Anfinson, 174 Wn.2d at 860.

III

Beard first challenges the trial court's issuance of the no guarantee-poor result jury instruction. He does so on three bases, claiming that: (1) it misstated the law, (2) it constituted an improper judicial comment on the evidence, and (3) in conjunction with the other challenged instruction, it unfairly emphasized the defense case. Beard's contentions are incorrect.

A

Beard initially argues that the no guarantee-poor result instruction was a misstatement of the law. This is so, he contends, because jurors were therein instructed that the poor medical result of Dr. Gala's alleged negligence (Supak's death) "could not be considered in determining whether Gala caused the poor

18

medical result."[10] Beard divines this limitation by reasoning that a poor medical result is an injury and an injury is one of the required elements that a claimant must establish to prove negligence.

To resolve this claim of error, we focus on the jury instructions given by the trial court as a whole. Once we do so, it is apparent that the claim of error is without merit.

Here, the trial court instructed the jury:

> A physician does not guarantee the results of his or her care and treatment. A poor medical result is not, by itself, evidence of negligence.

Jury Instruction 9.

The wording of this instruction followed that of Washington Pattern Jury Instruction 105.07:

> A [fill in type of health care provider] does not guarantee the results of his or her care and treatment.
> A poor medical result is not, by itself, evidence of negligence.

6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.07 (7th ed. 2019) (WPI).

In discussing this pattern instruction, our Supreme Court has explained that:

> The comment thereto states that the giving of a 'no guarantee/poor result' instruction does not constitute error if it is used to supplement a proper standard of care instruction. 6 Wash. Prac., *WPI,* at 523 (1989)[11] (citing Watson v. Hockett, 107 Wn.2d 158, 166-67, 727 P.2d 669 (1986)). Whether or not to give this type of instruction is a matter within the trial court's discretion.

---

[10] Br. of Appellant at 29.
[11] Christensen v. Munsen, 123 Wn.2d 234, 248, 867 P.2d 626 (1994) cites to the WPI in the 1989 edition of Washington Practice. In the current edition, the no guarantee-poor result instruction remains as WPI 105.07.

Christensen v. Munsen, 123 Wn.2d 234, 248, 867 P.2d 626 (1994).

Beard's claim that jury instruction 9 misstated the law reveals a lack of appreciation of the dissonance between principles taught in a law school torts class and principles applied to a superior court trial. As a result of this disconnect, Beard earnestly—albeit incorrectly—assigns error to a perfectly correct jury instruction.

In law school we are taught—and the law generally holds—that there are four elements to the tort of negligence: duty, breach of duty, proximate cause, and resulting harm. Mancini v. City of Tacoma, 196 Wn.2d 864, 879, 479 P.3d 656 (2021); see also W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS 164-65 (5th ed. 1984). However, as previously established, jury instructions are read as *a whole*, meaning that they are read in relation to one another. In fact, jurors are instructed to accept the law from the court regardless of what they might think the law is or ought to be. Indeed, the jurors herein were instructed on this very premise. See Jury Instruction 1. ("It also is your duty to accept the law as I explain it to you, regardless of what you personally believe the law is or what you personally think it should be. You must apply the law from my instructions to the facts that you decide have been proved.")

Thus, whether the challenged instruction correctly states the law is determined by the content of the jury instructions as a whole—not by the teachings in a torts textbook.

Here, the jury was not instructed that there were four elements of negligence. Instead, the jury was instructed as follows.

First, the court set forth the matters that plaintiff Beard had the burden of proving to prevail on his claim of health care negligence.

> The plaintiff has the burden of proving each of the following propositions:
> First, that the defendant Dr. Shaila Gala failed to follow the applicable standard of care *and was therefore negligent*;
> Second, that Supak Beard died; and
> Third, that *the negligence* of the defendant Dr. Shaila Gala was a proximate cause of the harms and losses alleged by the plaintiff.
> If you find from your consideration of all of the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendants.

Jury Instruction 6 (emphasis added).

The jury was next instructed that

> [a] health care professional owes to the patient a *duty to comply with the standard of care* for one of the profession or class to which he or she belongs.
> Dr. Shaila Gala, who is a rheumatologist, has a *duty to exercise the degree of skill, care, and learning expected of a reasonably prudent rheumatologist* in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question.
> *Failure to exercise* such skill, care, and learning *constitutes a breach* of the standard of care and *is negligence*.
> The degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question.

Jury Instruction 7 (emphasis added).[12]

---

[12] This instruction aligns with RCW 7.70.030 which provides: "No award shall be made in any action or arbitration for damages for injury . . . unless the plaintiff establishes one or more of the following propositions: (1) That injury resulted from the failure of a health care provider to follow the accepted standard of care."

The jury was then instructed that

> A physician does not guarantee the results of his or her care and treatment. A poor medical result is not, by itself, evidence of negligence.

Jury Instruction 9.

When the instructions are viewed as a whole, it is clear that jury instruction 9 was a correct statement of the law. As explained to the jury by the judge in jury instructions 6 and 7, negligence is established by proving the existence of a duty and a breach of that duty. Proof of "proximate cause" and "harms and losses" were set forth as concerns separate from proof of negligence in jury instructions 6 and 7.

Whether to issue a no guarantee-poor result jury instruction is a matter within the discretion of the trial court. The instruction is appropriately given when it is used to supplement a proper standard of care instruction and it serves the purpose of reminding jurors that medicine is an inexact science in which the desired results cannot be guaranteed. Watson, 107 Wn.2d at 167.

That a bad result "by itself" does not establish negligence is a correct statement of the law, as the law was given to the jury by the trial judge. It was within the trial court's discretion to give jury instruction 9 as a supplement to the standard of care instruction given. Beard's claim of error fails.

B

Beard next asserts that the issuance of the no guarantee-poor result instruction constituted a prohibited judicial comment on the evidence. We disagree.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. An improper judicial comment on the evidence is "'one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed or disbelieved the particular testimony in question.'" Adcox v. Children's Orthopedic Hosp. & Med. Ctr., 123 Wn.2d 15, 38, 864 P.2d 921 (1993) (quoting Hamilton v. Dep't of Lab. & Indus., 111 Wn.2d 569, 571, 761 P.2d 618 (1988)).

Judges do not comment on the evidence merely by properly instructing a jury on the law. "An instruction which does no more than accurately state the law pertaining to an issue does not constitute an impermissible comment on the evidence by the trial judge under Const. art. 4, § 16." Christensen, 123 Wn.2d at 249 (citing Hamilton, 111 Wn.2d at 571).

Our Supreme Court has previously held that a virtually identical no guarantee-poor result instruction did not constitute an improper comment on the evidence. Christensen, 123 Wn.2d at 249. We reach the same conclusion.

C

Beard's final objection to jury instruction 9 is that it, in conjunction with jury instruction 12 (the exercise of judgment instruction), unfairly emphasized the defense case.

We will address this claim of error in Section IV, in which we examine Beard's various objections to jury instruction 12.

IV

Beard next challenges the trial court's issuance of the exercise of judgment jury instruction. He does so on three bases, claiming that: (1) the instruction was not supported by sufficient evidence, (2) the instruction constituted an improper judicial comment on the evidence, and (3) in conjunction with the other challenged instruction, it unfairly emphasized the defense case. Beard's contentions are incorrect.

A

As to the sufficiency of the evidence challenge, our analysis of this issue requires us to discuss several predicate considerations. We do so in the sections that follow.

1

The challenged jury instruction at issue was worded as follows:

> A physician is not liable for selecting one of two or alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment, the physician exercised reasonable care and skill within the standard of care the health care provider was obliged to follow.

Jury Instruction 12. This followed the wording of Washington Pattern Jury Instruction 105.08.

> A physician is not liable for selecting one of two or more alternative [courses of treatment] [diagnoses], if, in arriving at the judgment to [follow the particular course of treatment] [make the particular diagnosis], the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

WPI 105.08.

24

Beard's perception of the propriety of this instruction is colored by his perception of it as being unique in the law. This view is expressed in his briefing on appeal. In discussing the instruction at issue along with the other challenged instruction, Beard contends that

> [t]hese instructions do not exist in other negligence contexts because they are palpably unfair to come from the judge. An automobile driver who hits a pedestrian in a crosswalk is not entitled to a jury instruction that drivers do not guarantee the results of their driving. Further, the same driver is not entitled to an instruction about the exercise of judgment while driving . . . .
> Even in other contexts involving specialized duties of care, defendants are not entitled to such instructions. . . . A crane operator sued for injuries sustained by a workplace mishap does not get an instruction that a crane operator is not liable for selecting one of two alternative methods of operating the crane if, in selecting the method, the operator exercised reasonable care.

Br. of Appellant at 36-38.

However, the principles underlying the exercise of judgment instruction are not at all unique in the law. To the contrary, a well-recognized legal doctrine premised on those same principles is theoretically applicable in any tort case and has been applied in countless negligence actions.

That doctrine, of course, is the emergency doctrine. A discussion of that doctrine, and its relationship to the exercise of judgment instruction, follows.

i

The emergency doctrine is sufficiently well-established so as to be the subject of a pattern jury instruction, which reads as follows:

> A person who is suddenly confronted by an emergency through no negligence of his or her own and who is compelled to decide instantly how to avoid injury and who makes such a choice

25

> as a reasonably careful person placed in such a position might make, is not negligent even though it is not the wisest choice.

WPI 12.02.[13]

> Our Supreme Court has stated that the evidence necessary
>
> to invoke the emergency doctrine is confrontation by a sudden peril requiring *instinctive reaction*. Seholm v. Hamilton, 69 Wn.2d 604, 419 P.2d 328 (1966). The rule is applicable only *after a person has been placed in a position of peril and there is a choice between courses of action* after the peril has arisen. Sandberg v. Spoelstra, 46 Wn.2d 776, 285 P.2d 564 (1955); Restatement (Second) of Torts § 296 ([AM. LAW INST.] 1965).

Zook v. Baier, 9 Wn. App. 708, 713-14, 514 P.2d 923 (1973) (emphasis added); see also Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 197, 668 P.2d 571 (1983) (citing Sandberg, 46 Wn.2d at 782; Seholm, 69 Wn.2d at 609). Indeed, the evidence presented must tend to prove that the circumstance in question was one in which the person involved was compelled to make a decision between choices—an emergency doctrine instruction is properly refused when there was no alternative course of action available to the person in question. Brown, 100 Wn.2d at 197 (citing Zook, 9 Wn. App. at 714). Thus, in order for the jury to be instructed on the emergency doctrine, the trial record must contain evidence that a person was confronted with an emergency presenting that person with a choice between courses of action as well as evidence that the person's choice was consistent with the applicable standard of care. WPI 12.02; Brown, 100 Wn.2d at 197; Zook, 9 Wn. App. at 713-14.

---

[13] Our decisional authority has recognized that "WPI 12.02 adequately informs the jury. It correctly states the law, is not misleading, and permits counsel to argue his theory of the case." Szupkay v. Cozzetti, 37 Wn. App. 30, 35, 678 P.2d 358 (1984) (citing State v. Mark, 94 Wn.2d 520, 526, 618 P.2d 73 (1980)).

Furthermore, "[i]f there is a conflict in the evidence as to the applicability of the emergency doctrine, but there is substantial evidence to support it, it is error not to submit the theory to the jury." Szupkay v. Cozzetti, 37 Wn. App. 30, 34, 678 P.2d 358 (1984) (citing Bell v. Wheeler, 14 Wn. App. 4, 538 P.2d 857 (1975)); see also Tuttle v. Allstate Ins. Co., 134 Wn. App. 120, 131, 138 P.3d 1107 (2006) ("[I]f the evidence is conflicting as to whether the doctrine applies, the court should give the instruction.").

Notably, as recognized by our Supreme Court, this instruction does not alter the underlying standard of care: "'[t]he so-called emergency rule is but a special application of the general standard of reasonable care.'" Sandberg, 46 Wn.2d at 783 (quoting Trudeau v. Sina Contracting Co., 241 Minn. 79, 84, 62 N.W.2d 492 (1954) (citing WILLIAM L. PROSSER, PROSSER ON TORTS § 37 (1st ed., 1941); RESTATEMENT (FIRST) OF TORTS § 296 (1934))).

The purpose of issuing an emergency doctrine instruction is that it "'requires a jury to consider the fact of sudden peril as a circumstance in determining the reasonableness of a person's response thereto.'" Sandberg, 46 Wn.2d at 783 (quoting Trudeau, 241 Minn. at 84 (citing PROSSER, supra, § 37; RESTATEMENT OF TORTS § 296)). Indeed, "'[t]he doctrine excuses an unfortunate human choice of action that would be subject to criticism as negligent were it not that the party was suddenly faced with a situation which gave him *no time to reflect upon which choice was the best*.'" Brown, 100 Wn.2d at 197 (emphasis added) (quoting Zook, 9 Wn. App. at 714). Thus, the instruction on the emergency doctrine is a reminder that, in the circumstance of an emergency

requiring a sudden, instinctive reaction between competing courses of action, a person who chooses a less wise course of action from among the available courses of action is not liable for making that less wise choice, so long as that choice was consistent with the applicable standard of care.

ii

The pattern instruction on a health care provider's exercise of judgment reads as follows:

> A physician is not liable for selecting one of two or more alternative [courses of treatment] [diagnoses], if, in arriving at the judgment to [follow the particular course of treatment] [make the particular diagnosis], the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

WPI 105.08.[14]

In determining whether to issue this instruction to the jury, the trial court should consider that

> [i]n the first place, as its terms make clear, it applies only where there is evidence that in arriving at a judgment, "the physician or surgeon exercised reasonable care and skill, within the standard of care he [or she] was obliged to follow." Secondly, its application will ordinarily be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses.

Watson, 107 Wn.2d at 165.

---

[14] Our Supreme Court has reaffirmed "that this court has consistently approved of the exercise of judgment jury instruction in appropriate medical malpractice cases." Fergen, 182 Wn.2d at 803-04 (citing Christensen, 123 Wn.2d at 238; Watson, 107 Wn.2d at 164-65; Miller v. Kennedy, 91 Wn.2d 155, 160, 588 P.2d 734 (1978); Miller v. Kennedy, 85 Wn.2d 151, 151-52, 530 P.2d 334 (1975); Miller v. Kennedy, 11 Wn. App. 272, 280, 522 P.2d 852 (1974)).

Furthermore, the exercise of judgment instruction allows a party to argue their theory of the case to the jury. See Fergen, 182 Wn.2d at 810 (discussing in the context of a challenge to the exercise of judgment instruction that "instructions that inform the jury of a party's theory of the case are not necessarily harmful or incorrect").

Furthermore, our Supreme Court has held that issuing the exercise of judgment instruction is proper when the record contains conflicting medical expert testimony as to whether the physician defendant's choice of treatment was consistent with the standard of care. Christensen, 123 Wn.2d at 249 (trial court did not err by giving "error in judgment" instruction when trial record contained evidence of three medical experts presenting conflicting testimony as to the proper choice between prescription medicine regimens).

In addition, as recognized by the Supreme Court in Watson, the exercise of judgment instruction does not alter the applicable standard of care: in discussing what was then referenced as the "error in judgment" instruction alongside "similar supplemental or clarifying instructions," our Supreme Court stated that such instructions "'supplement' the standard of care; while they may clarify it, they do not change it." 107 Wn.2d at 166-67 (citing Miller v. Kennedy, 91 Wn.2d 155, 159, 588 P.2d 734 (1978)).[15]

Therefore, the purpose for giving such an instruction—and the reason for clarification—is that it provides "'*useful watchwords to remind judge and jury that medicine is an inexact science* where the desired results cannot be guaranteed, and *where professional judgment may reasonably differ as to what constitutes proper treatment.*'" Watson, 107 Wn.2d at 167 (quoting JIM M. PERDUE & READ KHOURY, THE LAW OF TEXAS MEDICAL MALPRACTICE (2d ed.), ch. 2, reprinted in 22

---

[15] See also Fergen, 182 Wn.2d at 805 (the exercise of judgment instruction, in appropriate circumstances, "may be given to supplement a general instruction on the proper standard of care" (citing Christensen, 123 Wn.2d at 238; Watson, 107 Wn.2d at 165; Miller, 11 Wn. App. at 280)).

HOUS. L. REV. 47, 60 (1985)).[16]  Indeed, as stated by our Supreme Court more than one hundred years ago, "'[i]n cases like this *the court and jury do not undertake to determine what is the best mode of treatment* or to decide questions of medical science upon which surgeons differ among themselves.'"  Dishman v. N. Pac. Beneficial Ass'n, 96 Wash. 182, 203-04, 164 P. 943 (1917) (emphasis added) (internal quotation marks omitted) (quoting Staloch v. Holm, 100 Minn. 276, 283, 111 N. W. 264 (1907)).

Accordingly, the instruction on the exercise of judgment principle reminds the jury that, in the circumstance of the treatment of a patient for an uncertain condition that requires a choice between competing courses of treatment (or diagnoses), a physician who chooses a less wise course of action from among the available courses of action (both or all of which were consistent with the standard of care) is not liable for making that less wise choice, so long as the choice adopted was consistent with the standard of care.

iii

Given all of this, Beard's broad contention as to the uniqueness of the exercise of judgment instruction does not survive scrutiny.  Indeed, the legal principles underlying the emergency doctrine are comparable to those underlying the exercise of judgment instruction.  As an initial matter, they are both intended to supplement, that is, to clarify, their respective general instruction on the standard of care.  Such clarification of that standard is useful in both instances

---

[16] See also Fergen, 182 Wn.2d at 804 (purpose of the exercise of judgment instruction is "to remind juries of the fallibility of medicine" (citing Watson, 107 Wn.2d at 167)).

because the respective instructions remind the jury that the individual in question was confronted by a circumstance calling for action from among competing, reasonable courses of proceeding. And the respective instructions remind the jury that the individual at issue in such a circumstance is not liable for making a less wise choice from among the available reasonable courses of action, so long as the choice made was consistent with the applicable standard of care.

Furthermore, in order to be issued to the jury at trial, each instruction requires that the trial record contain evidence that the person at issue was confronted with a choice between competing courses of action and evidence that the choice made between those available courses was consistent with the standard of care. In addition, with regard to both instructions, when there is conflicting testimony as to whether the instruction should be issued, it is appropriate for the trial court to do so.

As a final note, a decision from another jurisdiction—a decision that our Supreme Court described as "well-considered"—is instructive. Dishman, 96 Wash. at 203 (citing Staloch, 100 Minn. at 283). In that decision, the Minnesota Supreme Court recognized with regard to what it termed the "error of judgment" principle:

> One reasonable justification for this exception in many cases *is the elementary principle that when a man acts according to his best judgment in an emergency but fails to act judiciously, he is not chargeable with negligence*. The act or omission, if faulty, may be called a mistake, but not carelessness. *Physicians in the nature of things are sought for and must act in emergencies*, and if a surgeon waits too long before undertaking a necessary amputation, he must be held to have known the probable consequences of such delay,

31

and may be held liable for the resulting damage.

Staloch, 100 Minn. at 282  (emphasis added) (citation omitted).

Thus, in light of the ample similarities between the instruction on the exercise of judgment and the instruction on the emergency doctrine, it cannot be said that the exercise of judgment instruction is unique in the law.  Rather, it appears to have its origins in the elementary principles of law set forth in the emergency doctrine.  Beard's characterization of the exercise of judgment instruction as a unique exception benefiting health care providers does not bear out.

2

Another predicate of Beard's evidentiary sufficiency contention is that the exercise of judgment instruction requires proof that a physician's reasoning underlying the physician's choice of treatment or diagnoses was, as to every data point or presence or absence of symptoms, consistent with the standard of care. This is so, according to Beard, because

> [b]y its plain language, the Exercise of Judgment Instruction requires a physician to "exercise reasonable care and skill within the standard of care" when "arriving at the judgment to follow the particular course of treatment."  This means that not only must the end choice of course of treatment meet the standard of care, *but also the reasoning behind the physician's choice must meet the standard of care*.

Br. of Appellant at 18 (emphasis added).

Beard's contention is that the exercise of judgment instruction must not be given in the absence of testimony that—at each step along the way—the physician's thought process was consistent with the standard of care.  In this

way, Beard argues, physician liability depends on proof of what the physician thought, rather than on what the physician did or failed to do. At bottom, Beard avers that a physician who treated a patient consistent with the standard of care and chose from among two or more treatment options where each approach would have been consistent with the standard of care could nevertheless be found liable by a jury that was persuaded that the chosen treatment option was not the wisest choice.[17]  This is not the law.

i

The exercise of judgment instruction has its origins in the common law of our state, and was variously described as a physician's "honest mistake" or "error of judgment," and when the underlying "mistake" or "judgment" was the physician's choice between diagnoses or methods of treatment. For instance, in 1917, our Supreme Court stated that

> [t]his court has recognized the law to be that a physician is not an insurer of a cure in cases of affliction under his care for treatment, and that he is not to be held liable as for negligence or malpractice for mere failure to cure, or for bad results, because of his *choosing one of two or more methods of treatment,* when *such choosing* is an exercise of honest judgment on his part and *the method so chosen* is one recognized by the medical profession as a proper method in the particular case, though it might not meet the unanimous approval of the medical profession.

Dishman, 96 Wash. at 187.

The court recognized that the applicable law "has been thoroughly settled by the decisions of this court" and that

---

[17] This, after all, is the result sought to be avoided by the exercise of judgment instruction.

"[t]he principal question here is whether a physician is, as a matter of law, liable for a wrong diagnosis and ensuing treatment based thereon, even where there may be an honest difference of opinion among members of the medical profession as to the diagnosis, if the diagnostician proceeded with due care, skill and diligence in treating the patient. . . .

It is now well settled that a physician is entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, and is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment *in making a diagnosis, in prescribing treatment, or in determining upon an operation*, where there is reasonable doubt as to the nature of the physical conditions involved, or as to what should have been done in accordance with recognized authority and good current practice.  30 Cyc. 1578; Merriam v. Hamilton, 64 Or. 476, 130 Pac. 406[ (1913)]; Wells v. Ferry-Baker Lum. Co., 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426[ (1910)]; Coombs v. James, 82 Wash. 403, 144 Pac. 536[ (1914)]; Lorenz v. Booth, s

Dishman, 96 Wash. at 201-02 (emphasis added) (quoting Just v. Littlefield, 87

Wash. 299, 303, 151 P. 780 (1915)).

A year later, our Supreme Court held that its prior decisions,

say that a physician cannot be held as for malpractice when no more is shown than a difference of opinion among experts as to whether or not there was an error of judgment in *adopting the method of treatment* which was adopted.  As said in the Lorenz case . . . , when there is more than one recognized method of treatment for a particular character of case, "the attending physician is not liable for an honest mistake of judgment in his *selection of the method of treatment*."

But there is an obvious distinction between a claim of negligence in the *choice of methods of treatment* and a charge of negligence in the actual performance of the work or treatment after such choice is made.

Swanson v. Hood, 99 Wash. 506, 512, 170 P. 135 (1918) (emphasis added)

(quoting Lorenz, 84 Wash. at 555; citing Dahl v. Wagner, 87 Wash. 492, 151

P. 1079 (1915)).

34

Fifty years later, in <u>Dinner v. Thorp</u>, 54 Wn.2d 90, 338 P.2d 137 (1959),

our Supreme Court considered an instruction that read as follows:

> "A physician is not liable for damages consequent upon an honest mistake or an error in judgment in **making a diagnosis** or in **determining upon a course of procedure** where there is reasonable doubt as to the nature of the physical conditions involved. If a physician brings to his patient care, skill, and knowledge he is not liable to the patient for damages resulting from his honest mistakes or a bona fide error of judgment. The law requires a physician to base any professional decision he may make on skill and careful study and consideration of the case, *but when the decision depends upon an exercise of judgment the law requires only that the judgment be made in good faith.*" (Italics ours.)

<u>Thorp</u>, 54 Wn.2d at 97-98 (bolded emphasis added). Although the court held

that the portion that it had italicized was inappropriate, the court left the

remainder of the instruction undisturbed.

In 1974, we approved of a jury instruction that read, "'[a] physician is not

liable for an honest error of judgment if, in *arriving at that judgment*, the physician

exercised reasonable care and skill, within the standard of care he was obliged to

follow.'" <u>Miller v. Kennedy</u>, 11 Wn. App. 272, 280, 522 P.2d 852 (1974)

(emphasis added), <u>aff'd</u>, 85 Wn.2d 151, 530 P.2d 334 (1975). Relying on our

Supreme Court's decision in <u>Thorp</u>, we stated that "the efforts of a physician may

be unsuccessful or the *exercise of one's judgment* be in error without the

physician being negligent so long as the doctor acted within the standard of

care." <u>Miller</u>, 11 Wn. App. at 280 (emphasis added) (citing <u>Thorp</u>, 54 Wn.2d 90).

Given all of this, our Supreme Court has historically used many different

phrases to describe a physician's decision between different courses of action,

including "choosing one of two or more methods of treatment," "the method so chosen," "making a diagnosis," "prescribing treatment," "determining upon an operation," "determining upon a course of procedure," "adopting the method of treatment," "selection of the method of treatment," and "choice of methods of treatment." For our part, in reliance on our Supreme Court's precedent, we have described a physician's decision between courses of action as "arriving at that judgment" and "the exercise of one's judgment."

The commonality between all of these phrases is that they focus on the reasonableness of the physician's choice between courses of medical treatment or diagnoses. These decisions do not, for their part, focus on the reasonableness of the physician's reasoning underlying such choices. Moreover, as set forth above, the exercise of judgment instruction has been justified on the basis of the underlying subject matter that it regards: the uncertainty inherent in the practice of medicine and the need for a physician to take decisive action in response to a patient seeking medical treatment. Given that uncertainty and the need for medical decision-making, it logically follows that the focus of the inquiry would be on the reasonableness of the choice made by the physician, rather than on the reasoning underlying such a choice. Thus, according to both our Supreme Court and our decisional authority during this time, a physician's judgment regarding treatments or diagnoses was the physician's choice between those treatments or diagnoses.

ii

In 1976, our legislature enacted a bill setting forth a statutory framework for medical malpractice actions, replacing, in part, the prior common law regime. SUBSTITUTE H. B. 1470, 44th Leg. 2d Ex. Sess. (Wash. 1975-76), ch. 56, § 6 at 217.  In so doing, the legislature established, in pertinent part, that

> [n]o award shall be made in any action or arbitration for damages for injury occurring as the result of health care which is provided after the effective date of this 1976 amendatory act, unless the plaintiff establishes one or more of the following propositions:
>    (1) That injury resulted from the failure of a health care provider to follow the accepted standard of care.

SUBSTITUTE H.B. 1470, § 8, at 217-18.  The legislature further established that

> [t]he following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
>     (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider in the profession or class to which he belongs, in the State of Washington, acting in the same or similar circumstances;
>     (2) Such failure was a proximate cause of the injury complained of.

SUBSTITUTE H.B. 1470, § 9 at 218.

Our Supreme Court, in Harris v. Groth, 99 Wn.2d 438, 451, 663 P.2d 113 (1983), later ruled that the effect of the bill was, in pertinent part, to establish a general standard of care for the law of medical malpractice.

iii

Then, in 1986, our Supreme Court announced its decision in Watson v. Hockett, 107 Wn.2d 158.  There, the court was presented with a challenge to the "error of judgment" jury instruction, including whether it was proper in light of the

legislature's recent enactment and, if so, whether the instruction given therein properly stated the law.

As part of its decision, the court rejected the assertion that the legislature's recent enactment impacted certain jury instructions—including the "error in judgment" instruction—explaining that, as above, such instructions

> "supplement" the standard of care; while they may clarify it, they do not change it.  Thus, these instructions can only be given in connection with a proper standard of care instruction. . . .  The purpose served by these instructions, used in the manner and form approved herein, is best described by using the words of one commentator who, in discussing similar supplemental or clarifying instructions, stated that
>> *these doctrines provide useful watchwords to remind judge and jury that medicine is an inexact science where the desired results cannot be guaranteed, and where professional judgment may reasonably differ as to what constitutes proper treatment.*

Watson, 107 Wn.2d at 166-67 (footnote omitted).

Turning to the merits of the case, the court first provided several general observations:

> The law of medical malpractice is for the most part based on theories of fault based liability.  Absent a contract promising the patient a particular result, a doctor will not normally be held liable under a fault based system simply because the patient suffered a bad result.   It must, rather, be shown that the doctor's conduct fell below a level that society considers acceptable.

Watson, 107 Wn.2d at 161 (footnotes omitted) (citing Brooks v. Herd, 144 Wash. 173, 176, 257 P. 238 (1927); Derr v. Bonney, 38 Wn.2d 678, 681, 231 P.2d 637 (1951); Crouch v. Wyckoff, 6 Wn.2d 273, 282, 107 P.2d 339 (1940); Harris v. Groth, 99 Wn.2d 438, 445, 663 P.2d 113 (1983)).  Notably, the court instructed that, "[i]n the absence of proof that the doctor failed to exercise the required level

of skill and care, the patient suing the doctor should not prevail." Watson, 107 Wn.2d at 161-62 (citing Versteeg v. Mowery, 72 Wn.2d 754, 755, 435 P.2d 540 (1967); Richison v. Nunn, 57 Wn.2d 1, 4-5, 340 P.2d 793 (1959)).[18]

Turning to the challenged instruction, the court ruled that

[t]he "error of judgment" instruction unanimously upheld by this court in Miller[ v. Kennedy, 91 Wn.2d 155, 588 P.2d 734 (1978)], and also proposed by Dr. Hockett in this case, is also proper:

A physician or surgeon is not liable for an *honest* error of judgment if, in **arriving at that judgment**, the physician or surgeon exercised reasonable care and skill, within the standard of care he was obliged to follow.

(Italics ours.) Miller, 91 Wn.2d at 160 n.4.[19] Henceforth, however, the italicized word "honest" should not be used in those cases where it is appropriate to give this instruction. This is because the use of the word "honest" imparts an argumentative aspect into the instruction which, as discussed above, does not coincide with current jury instruction practice. . . .

The error in judgment principle is accepted in this state as Miller makes clear.

Watson, 107 Wn.2d at 164-65 (bolded emphasis added).

The court further instructed, with regard to the error in judgment principle, that

[i]n the first place, as its terms make clear, it applies only where there is evidence that in *arriving at a judgment*, "the physician or surgeon exercised reasonable care and skill, within the standard of care he [or she] was obliged to follow." Secondly, its application will ordinarily be limited to situations where the doctor is confronted with a *choice among competing therapeutic techniques or among medical diagnoses*.

---

[18] "It is well settled that, before a physician or surgeon may be held liable for malpractice, he must have done something in the treatment of his patient" inconsistent with the standard of care "or he must have neglected to do something required by that standard." Versteeg, 72 Wn.2d at 755 (quoting Richison, 57 Wn.2d at 4-5).

[19] Our Supreme Court recognized that we "expressly approved this instruction in Miller v. Kennedy, supra at 280." Miller, 91 Wn.2d at 160.

Watson, 107 Wn.2d at 165 (citing Fall v. White, 449 N.E.2d 628, 635-36 (Ind. Ct. App. 1983); Truan v. Smith, 578 S.W.2d 73, 76 (Tenn. 1979); Spadaccini v. Dolan, 63 A.D.2d 110, 120, 407 N.Y.S.2d 840 (1978)).

Given all of this, the court in Watson reiterated that which earlier Washington state appellate decisional authority had made clear: a physician's judgment regarding treatments or diagnoses is the physician's *choice* between those treatments or diagnoses. As discussed above, the phrase a physician's "arriving at a judgment" between competing therapeutic techniques or among medical diagnoses is merely another way in which Washington state appellate courts have referred to the physician's choice made between such treatments or diagnoses.

iv

Nevertheless, Beard contends that our Supreme Court's most recent decision in Fergen v. Sestero, 182 Wn.2d 794, supports his contention that the exercise of judgment instruction requires not only proof that a physician's choice of treatment or diagnosis was consistent with the standard of care but also requires proof that the physician's reasoning underlying that choice was consistent with that standard. We disagree.

In Fergen, the court was presented with a challenge as to the propriety of a jury instruction based on WPI 105.08, the exercise of judgment instruction, previously set forth herein.[20] 182 Wn.2d at 798-99. The court rejected that

---

[20] In granting review, the court had consolidated two cases. In one case, a physician had examined a lump on a patient's ankle, diagnosed it as a benign cyst, and did not pursue additional diagnostic testing to rule out the possibility of a rare and aggressive form of metastatic cancer. Fergen, 182 Wn.2d at 799-800. The physician testified that "'malignancy' is 'a

challenge, holding that "[w]e reaffirm that this instruction is supported in Washington law and has not been shown to be incorrect or harmful." Fergen, 182 Wn.2d at 799.

In the opening paragraph of its decision, the court stated as follows:

"The most critical element of most medical malpractice claims based on negligence . . . is the standard of care owed by the doctor to his or her patient." Watson v. Hockett, 107 Wn.2d 158, 162, 727 P.2d 669 (1986). In order to provide a lay jury with the best possible understanding of this fundamental, yet often confusing, component of legal liability, supplemental standard of care instructions are sometimes used in addition to the basic instructions. One of these supplemental instructions is the exercise of judgment instruction, which reminds juries that if a physician exercises the reasonable care and skill generally required by his or her position, just *choosing between alternate treatments or diagnoses* does not make them legally liable for making a wrong *choice.*

Fergen, 182 Wn.2d at 798 (emphasis added) (alteration in original).

The court then began its analysis by stating:

Petitioners first urge the court to find that this instruction is not fully accepted in Washington law. We reject this invitation and reaffirm that this court has consistently approved of the exercise of judgment jury instruction in appropriate medical malpractice cases. Miller v. Kennedy, 85 Wn.2d 151, 151-52, 530 P.2d 334 (1975) (Miller II) ("We can add nothing constructive to the well considered opinion of [the Court of Appeals] and, accordingly, approve and adopt the reasoning thereof." (citing Miller v. Kennedy, 11 Wn. App. 272, 280, 522 P.2d 852 (1974) (Miller I) (instruction is an appropriate statement of the law))); Miller v. Kennedy, 91 Wn.2d 155, 160, 588 P.2d 734 (1978) (Miller III) (reminded parties that the court explicitly approved of the instruction in Miller II and held that the instruction was appropriate under these facts because the physician utilized judgment in performing the biopsy procedure);

---

consideration anytime you see a lump,'" but did not specifically testify that he considered whether the lump was malignant on the day in question. Fergen, 182 Wn.2d at 800. In the other case before the court, multiple physicians had examined a patient's report of pain and firmness in his left leg, each made different diagnoses, but none had performed a leg pressure test to rule out a diagnosis of compartment syndrome. Fergen, 182 Wn.2d at 799-801.

41

> Watson, 107 Wn.2d at 164-65 (reminded parties of unanimous decision in Miller III and again affirmed the propriety of this instruction); Christensen, 123 Wn.2d at 238 (affirmed Watson and held that use of the instruction is proper in the appropriate factual situation).
>
> Over the years, the wording on the instruction has changed to improve the instruction and address specific diction concerns. Dinner v. Thorp, 54 Wn.2d 90, 98, 338 P.2d 137 (1959) (the court eliminated "good faith" from the instruction, holding that a physician must exercise skill and learning, not just good faith); Watson, 107 Wn.2d at 164-65 (future jury instructions should remove the word "honest" since it inserts an argumentative aspect not appropriate for jury instruction practice); WPI 105.08, at 612-13 ("error of judgment" was changed to "exercise of judgment" in order to eliminate juror misunderstanding of the interplay between the standard of care and a physician error). Despite this language clarification, the use of the instruction itself continues to be affirmed.

Fergen, 182 Wn.2d at 803-04 (alteration in original).[21]

Thereafter, the court summarized the holding in Watson as follows:

> In Washington, an exercise of judgment instruction is justified when (1) there is evidence that the physician exercised reasonable care and skill consistent with the applicable standard of care in *formulating his or her judgment* and (2) there is evidence that the physician made a *choice* among multiple alternative diagnoses (or courses of treatment). Watson, 107 Wn.2d at 165; Christensen, 123 Wn.2d at 249.

Fergen, 182 Wn.2d at 806 (emphasis added).

Contrary to Beard's assertion, the court in Fergen was not announcing an expansion of the requirements for the exercise of judgment instruction. Rather, given its repeated reliance on Watson, the court was dutifully following the principles of law set forth in Watson and its antecedent authority. Given that, the court's use of the phrase "formulating his or her judgment"—like "arriving at a

---

[21] In addition, the court, in reliance on precedent including Watson, rejected once more an assertion that the exercise of judgment instruction was preempted by the legislative enactment discussed herein, codified at chapter 7.70 RCW. Fergen, 182 Wn.2d at 805 (citing Watson, 107 Wn.2d at 166; Gerard v. Sacred Heart Med. Ctr., 86 Wn. App. 387, 388, 937 P.2d 1104 (1997)).

judgment"—is nothing more than another iteration of the same principle discussed herein: in choosing between competing methods of treatment or diagnoses, each or all of which would be consistent with the standard of care, a physician's judgment is the physician's choice.

v

Lastly, one of our more recent decisions is instructive as to what circumstances constitute a physician making a choice between courses of treatment or diagnoses. In Needham v. Dreyer, 11 Wn. App. 2d 479, we considered a challenge to the trial court's issuance of the exercise of judgment instruction to the jury. There, the physician had treated several of Needham's medical conditions but had not specifically responded to or addressed his reported breathing symptoms. Needham, 11 Wn. App. 2d at 484. Needham later alleged that the doctor was negligent for failing to consider, treat, and make a diagnosis regarding those breathing symptoms. Needham, 11 Wn. App. 2d at 485-86. Thereafter, the trial court, over Needham's objection, issued the exercise of judgment instruction to the jury in the resulting trial. Needham, 11 Wn. App. 2d at 486. On appeal, Needham asserted that the court's issuance of that instruction was improper because, by failing to address his breathing symptoms, the doctor did not exercise medical judgment as to those symptoms and, therefore, did not make a choice between diagnoses or courses of treatment. Needham, 11 Wn. App. 2d at 489-90. We agreed.

In reliance on Fergen, we stated that "the instruction is proper only when there is evidence that the physician made a choice among multiple alternative

diagnoses or courses of treatment." Needham, 11 Wn. App. 2d at 490 (citing Fergen, 182 Wn.2d at 806). Although the record contained evidence that the doctor therein may have been presented with a choice among diagnoses or methods of treatment for his breathing symptoms, the defendants had failed to present evidence that the doctor had *made* a choice between those diagnoses or treatment. Needham, 11 Wn. App. 2d at 490-92; see also Davies v. MultiCare Health Sys., 18 Wn. App. 2d 377, 394-96, 491 P.3d 207 (2021) (issuance of exercise of judgment instruction was proper because trial record contained evidence that physicians were presented with a treatment choice regarding additional diagnostic testing and that such physicians made a choice consistent with the standard of care to not order such testing), rev'd on other grounds, 199 Wn.2d 608, 510 P.3d 346 (2022).

3

To sum up, the exercise of judgment instruction may be given when there is proof that a physician was confronted with a choice between competing diagnoses or methods of treatment, each or all of which would be consistent with the standard of care, and proof that the choice made by the physician among those competing options was consistent with the standard of care. Affirmative evidence that the physician's reasoning underlying that choice was consistent with that standard is not required.

The instruction on the exercise of judgment principle recognizes that the practice of medicine is an inexact science requiring decisive action by a physician. It, again, follows from another basic principle: "[i]n the absence of

proof that the doctor failed to exercise the required level of skill and care, the patient suing the doctor should not prevail." Watson, 107 Wn.2d at 161-62 (citing Versteeg, 72 Wn.2d at 755; Richison, 57 Wn.2d at 4-5). It thereby serves to remind the jury that, if a physician is presented with a choice between competing treatments or diagnoses, and either choice is consistent with the standard of care, a physician is not liable for making the less wise choice.

B

With the foregoing analysis in mind, we next consider whether the record contains sufficient evidence to support the trial court's decision to issue an exercise of judgment instruction to the jury herein. We conclude that it does.

1

We have previously set forth the general principles applicable to a challenge to a jury instruction. In addition, this court has stated that

> [w]e review a decision on whether to give an exercise of judgment instruction for abuse of discretion. Seattle W. Indus., Inc. v. David A. Mowat Co., 110 Wn.2d 1, 9, 750 P.2d 245 (1988); Thomas v. Wilfac, Inc., 65 Wn. App. 255, 264, 828 P.2d 597 (1992). If a party's case theory lacks substantial evidence, a trial court must not instruct the jury on it. Albin v. Nat'l Bank of Commerce of Seattle, 60 Wn.2d 745, 754, 375 P.2d 487 (1962); State v. Hughes, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). The converse is true as well. Kelsey v. Pollock, 59 Wn.2d 796, 798-99, 370 P.2d 598 (1962); Cooper's Mobile Homes, Inc. v. Simmons, 94 Wn.2d 321, 327, 617 P.2d 415 (1980). In this context, evidence supporting a party's case theory "must rise above speculation and conjecture" to be substantial. Bd. of Regents of Univ. of Wash. v. Frederick & Nelson, 90 Wn.2d 82, 86, 579 P.2d 346 (1978). In other contexts, evidence is substantial if a "sufficient quantum [exists] to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

45

Fergen v. Sestero, 174 Wn. App. 393, 396-97, 298 P.3d 782 (2013) (alteration in original) (footnote omitted), aff'd, 182 Wn.2d 794, 346 P.3d 708 (2015).

"[T]he standard of care is generally established only through the testimony of physicians." Keogan v. Holy Fam. Hosp., 95 Wn.2d 306, 325, 622 P.2d 1246 (1980) (citing Versteeg, 72 Wn.2d at 755). Thus, physician testimony as to the applicable standard of care is expert witness testimony for the purpose of the rules of evidence. See ER 702, 703.

> A challenge to the sufficiency of the evidence, of course, admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made.

Richison, 57 Wn.2d at 4 (citing Traverso v. Pupo, 51 Wn.2d 149, 151, 316 P.2d 462 (1957)).

And, once again, the exercise of judgment instruction

> applies only where there is evidence that in arriving at a judgment, "the physician or surgeon exercised reasonable care and skill, within the standard of care he [or she] was obliged to follow." Secondly, its application will ordinarily be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses.

Watson, 107 Wn.2d at 165 (alteration in original). It is appropriate to provide that instruction when the record contains conflicting medical expert testimony as to whether the physician defendant's choice of treatment or diagnoses was consistent with the standard of care. Christensen, 123 Wn.2d at 249.

2

We now turn to the evidence presented at trial regarding whether Dr. Gala was confronted with a choice among competing methods of treatment and whether the treatment choices that Dr. Gala made were consistent with the standard of care.

i

At trial, as an initial matter, Dr. Gala provided testimony regarding her prescription of prednisone to treat Supak's lupus flares during the time in question. Dr. Gala testified that, in November 2017,

> [w]ith prior arthritis flares, [Supak] had responded to increase in prednisone, and she was having pain and I wanted to make sure that we treat her arthritis flare quickly to reduce her pain and also to treat her lupus disease, and I increased her prednisone to that 15 milligrams. I was hopeful at that visit that I could taper down to lower doses to manage the arthritis flares.

Dr. Gala testified that, in early January 2018, when she heard Supak "reported that her arthritis flared up, or the improvement she had wore off when she got below 15 milligrams of prednisone," she "asked Mrs. Beard to increase her prednisone to the 20 milligrams in hopes to get improvement of her lupus arthritis flare."

Dr. Gala then testified that, by mid-January, she again increased Supak's prednisone dose to treat her active arthritis flare:

> Q        How did you come to the judgment for your patient Supak Beard, that you had been taking care of for more than ten years at this point, how did you come to the judgment that in your estimation increasing her prednisone to 60 milligrams for two weeks and then decreasing it to 40 milligrams was a reasonable plan for Mrs. Beard?

A    It was reasonable. Mrs. Beard had an active arthritis disease. In order to quickly treat and control the inflammation that was involving multiple joints, we needed an agent that would improve the inflammation quickly, and that is prednisone. Other treatments that we have would take a long time before we could get control of the arthritis.

Q    Were you mindful with the dosing of prednisone, whether that was in November or January 4 or January 15, were you mindful of what you told the jury earlier, that prednisone is known to carry an increased risk for infection?

A    Yes.

Q    Were you also concerned that not controlling this flare associated with significant inflammation that that, too, could increase her risk of infection if you didn't get it under control?

A    Yes.

Dr. Gala further testified that, thereafter, she asked Supak to stay on the 60 milligram dose of prednisone because, "[w]ith the elevated liver tests, I wanted to hold methotrexate. I was concerned that that could be contributing to those lab changes. And with the active inflammation of her joints, I wanted to hold steady her prednisone dose."

Dr. Gala further testified that, during Supak's office visit on March 1, she became aware that Supak had "tapered prednisone to 20 milligrams every day over the course of the last few weeks" and that "[w]ith tapering, joint pain was returning in her shoulder, her right wrist, and now having, again, difficulty making a fist." Dr. Gala testified that Supak's report that day

told me that as she tapered through the month of February, her arthritis was active again.

Q    All right. And what was your plan to address that return of her flare with the lower dose of prednisone?

A    With the return of her flare, I increased her prednisone to 40 milligrams once a day.

Q    All right. And why was that, in your mind, important to do that day?

48

A     My concern was that the tapering went too fast and this led to the flare that she was experiencing and that I wanted to get it back under control.

Q     When you learned that she had had such a good period of time on a higher dose of prednisone, traveling, working, so on and so forth, but as of this visit she has a return of her flares with a decrease, what does that mean to you? What are you looking to do there?

A     Well, it means to me that her lupus is active, particularly her joints, and that I needed to get it back under control with an increase in prednisone.

Q     All right. We're going to talk in just [a] moment about your concern for infection. Were you concerned that increasing the prednisone to 40 milligrams would increase her risk of infection that day?

A     We're always cognizant that any change in prednisone certainly puts that as a concern.

The exhibits setting forth Dr. Gala's treatment notes during this time reflect that she was aware of Supak's report of decreased symptoms on higher doses of prednisone and increasing symptoms after tapering down her prednisone dose, that she physically examined Supak and observed medical signs consistent with Supak's reported symptoms, that she assessed that Supak was experiencing a lupus arthritic flare, that she had to discontinue a lupus flare medication, and that she prescribed prednisone at the doses set forth above in response to Supak's history, reported symptoms, and clinical presentation.

Dr. Volkmann, in her capacity as a medical expert in rheumatology, testified that Dr. Gala's decisions regarding Supak's prednisone doses were consistent with the standard of care. This was so, according to Dr. Volkmann, because, by January and February 2018, the lower prednisone dose had not controlled Supak's inflammation, Dr. Gala had to discontinue another of Supak's lupus flare medications, and "more joints were involved, that could be a sign that

the inflammation was starting to spread throughout the body, and might need a higher dose to control that inflammation." The increased dose was also reasonable because, even though it presented an increased risk for infection, not treating Supak's lupus flare-up would also increase her risk for infection. Dr. Volkmann also testified that Dr. Gala's decision on March 1 to increase Supak's prednisone dosage to 40 milligrams was consistent with the standard of care because Supak's lupus flare arthritis symptoms had a pattern of returning after the instances in which Supak had decreased her prednisone dose.

Dr. Gala also provided testimony regarding her investigation into whether Supak had an infection on March 1. Dr. Gala testified that, on March 1, she had been aware of Supak's February 5 urgent care clinic visit, including that Supak had presented with a fever but no cough, that the chest X-ray from that visit showed possible pneumonia, that the radiologist had told the urgent care physician to consider following-up with further imaging, that Supak was prescribed antibiotics as a precautionary measure, that she later cancelled a follow-up appointment because she no longer had a fever and was feeling better, that she went on a week-long vacation shortly thereafter, and that she returned to work after that vacation.

Dr. Gala further testified that, on March 1, she did not think that a repeat chest X-ray was warranted in light of Supak's reported symptoms on that day, including the absence of a cough and shortness of breath, the results of her examination of Supak's lungs, which she observed were clear to auscultation, and her determination that the February "infection had resolved with the

treatment instituted by the walk-in clinic." Dr. Gala testified that, because of Supak's fever in the clinic on March 1, "I was thinking of the possibility it was related with her lupus flare but also concerned of the possibility of infection."

> Q  And what did you do in considering the possibility for infection in Mrs. Beard?
> A  I asked her to complete a blood culture and urine culture.
> Q  And when we're looking at the report of fever and a concern for that potentially reflecting an infection, what are the things that you learned during that visit that are reassuring to you even though you're going to pursue a workup for infection?
> A  So I was reassured by her history of no chest pain or shortness of breath or cough.  I was also reassured on examination of her lungs and her chest.  Her exam was consistent with an arthritis flare, but I did feel, with the one day of fever, that I needed to check blood and urine cultures for evaluation.

The exhibit containing Dr. Gala's March 1 treatment notes set forth Dr. Gala's notations regarding Supak's early February treatment:

> Patient then developed a fever in early Feb with temp 102.9.  Seen in [walk-in clinic].  Possible pneumonia although patient reports she had no cough or difficulty breathing. . . .  Patient reports feeling much better after starting [antibiotics] from [walk-in clinic].  She reports going to Florida with husband to visit in laws from 2/10 – 2/17/18.  Felt well during this time.  No fevers.

The March 1 treatment note further reflected Dr. Gala's notation that "[t]oday she reports having chills this a[.]m[.] and noted to have fever here in the office.  No fever yesterday but she did have some chills.  Husband with strep throat.  Patient denies cough, sore throat or difficulty in breathing."  The treatment note also set forth the following: Dr. Gala's observation of Supak's lung as being "[c]lear to auscultation," the text of the February 5 chest X-ray report, Dr. Gala's assessment that Supak had "high fever in early Feb that resolved with [antibiotics] but now with return of chills and fever today," and Dr. Gala's

conclusion that the "[e]tiology of fever is unclear. Lungs [clear to auscultation]. Check urine culture and blood culture today."

Dr. Brown, Beard's expert witness on rheumatology, for his part, testified that the standard of care required Dr. Gala to order a chest X-ray on March 1 as part of investigating for an infection.

Dr. Volkmann, in contrast, testified that Dr. Gala ordering blood and urine cultures, but not ordering a chest X-ray on March 1, was consistent with the standard of care.

> Even though chest X-rays are often part of the standard workup for infection, we know that the patient the month prior had a presumed pulmonary infection, was treated with antibiotics and her symptoms went away and she was feeling better, so well that she was able to travel and go places, and so because of that it wasn't necessary to repeat a chest X-ray because she responded so well to the antibiotics.

Moreover, Dr. Volkmann testified,

> the patient didn't have any localizing signs of infection, she didn't have abdominal pain which might warrant doing abdominal imaging, she didn't have any respiratory symptoms which might warrant looking at her lungs, she really started with the broad workup, and that is looking in the blood to see if there's an infection there, and looking in the urine to see if there's an infection there.
>     And these are two common places that we look in patients who don't have any kind of localizing signs of where the infection will be. And in patients with lupus in particular, the most common site where we see infection is actually in the urine, and they usually get bacterial urinary tract infections.

With regard to her treatment investigating Supak's abnormal liver function testing and subsequent ordering of a referral to gastroenterology, Dr. Gala testified that

> [s]o initially, even though she had only two doses of methotrexate, I was concerned the liver tests were related to the medication I had instituted. With holding methotrexate, her liver tests remained elevated, and at that point, I did not feel it was tied to the methotrexate medication, as she had been holding it for some time. And so I wanted to recheck her labs, and if her liver tests were elevated, I wanted to pursue a gastroenterology consultation.

Dr. Gala testified that her plan on March 1 was

> [t]hat we are going to treat her lupus arthritis flare. We're also going to evaluate for the possibility of infection, given one day of fever, and that we needed to follow up on these elevated liver function tests. And with the labs that I ordered on March 1st, those results guide me. And if elevated, I would send her to gastroenterology, or refer to her gastroenterology.

Dr. Gala further testified that, when the liver functioning test results came back abnormal, she referred Supak to a gastroenterologist.[22] Dr. Gala additionally testified that, in ordering that referral, she did not tell the consulting gastroenterologist that Supak had a fever or that she was considering that Supak may have an infection because "Dr. King is a board-certified gastroenterologist. I knew that she would know how to evaluate Mrs. Beard, and she knows how to do her job as a gastroenterologist." Dr. Gala also testified that her gastroenterology colleagues "would be able to take the history from Mrs. Beard and examine her and come to a determination of what needed to be done."

Dr. Brown, for his part, testified that the standard of care required Dr. Gala to personally contact the gastroenterologist and tell him that she suspected that Supak had an infection.

---

[22] Dr. Gala testified that she did not order the gastroenterology referral on an urgent basis because "[t]here was not a need at this point to do an urgent consultation."

Dr. Volkmann, in contrast, testified that the manner in which Dr. Gala referred Supak to a gastroenterologist was consistent with the standard of care. This was so, according to Dr. Volkmann, because, "generally, when we do referrals to other consults, we don't call the person," "all of the information that the consultant needs about the patient is in the electronic medical record," and it is reasonable for a rheumatologist to assume that, in meeting with a patient, the physician to whom the referral was made would review the patient's medical record, obtain a medical history, and conduct a physical examination.

With regard to ordering an urgent referral to an infectious disease specialist, Dr. Gala testified that, on March 1, she did not believe that such a referral was necessary.

> Q      Okay.  And have you sent patients of yours where you believed that the patient is actively having an infection and you're concerned about their medical stability?  Have you sent patients to the emergency department in that scenario?
> A      Yes.
> Q      And was there anything in your assessment of all of the things that you knew about Mrs. Beard on March 1st, including her history from the month prior, that led you to feel that she had a need for any referral to infectious disease or to the emergency department for an infection?
> A      No.

Instead, Dr. Gala testified, her treatment plan as of March 1 was "[t]o continue as per our office visit, her prednisone for treatment of her lupus arthritis flare, and I was reviewing the pending culture results."

Dr. Gala also testified that, when she learned that Supak had a fever of 100.7 degrees on March 2, it did not change how she felt she needed to approach Supak's treatment.

Q      Did it seem to you that knowing that the next morning Mrs. Beard had a fever of 100.7, that that turned this into an urgent need for referral to an outside specialty, specifically infectious disease?

A      No.

Q      And why not?

A      Her cultures were negative to date, meaning every day I get results from the lab informing me if there's any growth on the culture.  So I was reviewing that, and the plan for Mrs. Beard was as we stated before on the March 1st visit.

Dr. Brown, for his part, testified that on March 1 and March 2, Dr. Gala was required by the standard of care to urgently refer Supak to an infectious disease specialist.

Dr. Volkmann, in contrast, testified that Dr. Gala not urgently referring Supak to an infectious disease specialist on March 1 or March 2 was within the standard of care.  This was so, Dr. Volkmann testified, because on March 1,

[t]here was nothing urgent about her presentation on this day that would necessitate an urgent evaluation from infectious disease. She had a low-grade fever, and this is something that's pretty common in patients with lupus.  There was nothing abnormal about the temperature that she had.  She had no other localizing signs of infection, and I think if this chart crossed the desk of an infectious disease doctor they also would not think that there was any urgent need to see this patient.

Dr. Volkmann further testified that Dr. Gala's medical treatment provided to Supak on March 2—to wait for the blood and urine cultures and not urgently refer Supak to a specialist—was consistent with the standard of care.  This was so, according to Dr. Volkmann, because

when we do urgent referrals to other specialists, there has to be a reason why we're doing the urgent referral, and in this case, the patient had a fever for one day and it continued for another day, but the treatment that was prescribed, the increase in prednisone, only has one day to work, so we really wouldn't expect a change in the fever at that early time point.

In addition, Dr. Gala had ordered studies to check for an infection in the blood and the urine, and she communicated that those were still pending that next day. So she was still looking to see whether there was an infection at that time to explain why the fever was there.

With regard to her treatment of Supak on March 5, upon learning that she had a symptom of blood in her stool, Dr. Gala testified that she asked her staff to facilitate getting Supak a gastroenterology appointment with a physician and ordered a stool study. These additional steps were warranted, according to Dr. Gala's testimony, in light of Supak's newly reported symptom and the need to evaluate the stool for infection.

Dr. Volkmann testified that the treatment that Dr. Gala provided to Supak on March 5 was consistent with the standard of care "[b]ecause when she learned that the patient had blood in the stool, she then followed that up and got a stool culture to see if there was any infection in the stool."

ii

The parties later rested their cases in chief. A jury instruction colloquy followed. In response to an objection by Beard's counsel to the issuance of the exercise of judgment instruction, defense counsel replied,

> in a medical malpractice [case] like this one, where judgment is at issue in the case, where there is evidence, which we have in spades in this case, of Dr. Gala facing a choice of competing therapeutic treatments and/or diagnoses, . . . this instruction [is] . . . very appropriate.
> In this case, we have the choice between getting a chest X-ray or not. We have the choice between doing something more on March 2nd with the fever continuing or not. We have the choices related to dosing that we've heard lots of testimony about how Dr. Gala did and should consider the risks and benefits of dosing prednisone. We have heard about the different differential diagnoses that Dr. Gala considered, including infection and lupus

and elevated liver function tests. We've heard a plethora of testimony about whether referral to gastroenterology was a reasonable choice or not, whether she should have instead referred to infectious disease or not and the choice associated with that.

. . . .

The intended purpose of the "exercise of judgment" instruction has been recognized as reminding jurors of the proposition that medicine is an inexact science where professional judgment may reasonably differ from what constitutes proper treatment. That is squarely within the issues of this case. It is squarely supported by all of the evidence from both sides in this case, and it is the defense for Dr. Gala.

The trial court then overruled Beard's objection, concluding,

[i]t's clear to me that this instruction does have some basis in the facts. Actually, this instruction could actually work, maybe, both ways based upon the evidence. [Fergen v. Sestero] does say that the instruction can be given. It didn't overturn the instruction. I recognize that one should proceed cautiously, but I believe that based upon the evidence that I heard there is facts to support this.

The court ruled that it would issue the exercise of judgment instruction, set forth herein, to the jury.[23]

iii

The trial court did not abuse its discretion in issuing the exercise of judgment instruction to the jury. First, the trial record contains numerous bases on which a jury could find that Dr. Gala was presented with circumstances requiring her to make a choice between methods of treatment including the following: increasing Supak's prednisone dosage or maintaining (or lowering) her prednisone dosage during the time in question; ordering urine and blood testing or ordering urine and blood testing as well as another chest X-ray on March 1;

---

[23] Beard did not request that the trial court modify the instruction in any way nor did he request that the court issue any type of limiting instruction in conjunction with the challenged instruction.

continuing to wait for the urine and blood test results or urgently referring Supak to an infectious disease specialist on March 2; and referring Supak to a gastroenterologist and trusting that the consultant would review the record or issuing such a referral and personally contacting the gastroenterologist ahead of the appointment. Given all of this, the record contains evidence that Dr. Gala was presented with multiple circumstances requiring her to choose between different methods of treatment.

The record also reflects that Dr. Gala made choices—that is, exercised her medical judgment—during the time in question in the response to the evolving dynamics surrounding Supak's treatment. For instance, Dr. Gala adjusted Supak's prednisone dose in response to her reported symptoms, clinical observations, the laboratory test results, and imaging studies. Dr. Gala ordered blood, urine, and stool cultures in response to Supak's reported—and clinically observed—fever and her reported blood in her stools. Dr. Gala referred Supak to a gastroenterologist in response to ongoing abnormal liver functioning tests. And, in response to Supak's new symptoms of a second day of fever and three days of blood in her stools, Dr. Gala chose to continue to review Supak's pending urine and blood culture tests each day and order a stool pathogen panel as she waited for the test results to finalize.

Lastly, the record contains expert witness testimony supporting that Dr. Gala made choices that were consistent with the rheumatological standard of care. As set forth above, Dr. Volkmann, a rheumatological expert witness, testified that each of Dr. Gala's choices discussed herein were consistent with

the standard of care. Moreover—although not necessary to the issuance of the exercise of judgment instruction—Dr. Volkmann provided cogent reasoning as to why each of those choices were within the standard of care.

Given all of that, the record contains ample evidence supporting that, in the course of treating Supak during the time in question, Dr. Gala was confronted with choices among competing methods of treatment or diagnoses and that the choices that she made were consistent with the standard of care. The trial court did not abuse its discretion by issuing the exercise of judgment instruction to the jury.

3

Beard nevertheless presents several challenges to the sufficiency of the evidence adduced at trial. Each challenge fails.

i

Beard first asserts that the record did not contain sufficient evidence to warrant issuance of the exercise of judgment instruction because the record did not set forth evidence that Dr. Gala's reasoning underlying certain of her treatment choices was consistent with the standard of care and because Dr. Volkmann's and Dr. Gala's testimony explaining the reasoning underlying Dr. Gala's treatment choices were not identical. Beard's assertion fails.

As set forth in Section A, supra, our decisional authority only requires that the record contain evidence that the physician was confronted with a choice between competing methods of treatment (or diagnoses) and that the physician's choice among those competing options was consistent with the standard of care.

Proof that the reasoning underlying such a choice was consistent with that standard is not required. Furthermore, as set forth in Section B herein, the record contained evidence on which a jury could find that Dr. Gala was confronted with choices, made choices, and that per Dr. Volkmann's testimony, such choices were consistent with the standard of care. Proof that Dr. Gala's reasoning was consistent with the standard of care was not necessary.

Therefore, Beard is not entitled to rely on such argument as a basis for refusing to issue the exercise of judgment instruction. Instead, he could have argued the fact questions presented to the jury as a basis for the jurors to determine that the challenged instruction did not properly apply to several of the defendant's challenged choices. Our review of the record does not disclose such an argument being advanced. In any event, the jury was permitted to weigh the evidence as it saw fit.

ii

Beard next asserts that the record did not contain sufficient evidence to warrant issuance of the challenged instruction because Dr. Brown's and Dr. Volkmann's expert testimony conflicted as to whether Dr. Gala's choices of treatment were consistent with the standard of care.

This assertion fails as well. There was sufficient testimony presented that, viewed in the light most favorable to Dr. Gala, supported the issuance of the instruction. The existence of a dispute among the expert witnesses produces questions for the jury—it does not militate against issuing the challenged instruction.

iii

Beard also asserts that the record did not contain sufficient evidence to warrant issuing the challenged instruction because the record contained undisputed medical expert testimony that Dr. Gala's treatment fell below the standard of care as to certain choices of treatment or reasons for choosing such treatment.

Beard's challenge fails again. As set forth herein, the record contains evidence supporting that Dr. Gala was confronted with choices among treatment options and that the choices that she made were within the standard of care. This was enough for the requirements of the exercise of judgment instruction to be met as to those choices. That another expert witness testified that Dr. Gala's conduct fell below the standard of care on an unrelated aspect of her treatment of Supak does not affect the evidence adduced in support of issuing the challenged instruction. It is not a reason to decline to issue the challenged instruction. Rather, such testimony could, once again, provide a basis for the plaintiff to argue to the jury the inapplicability of the challenged instruction to Dr. Gala's conduct. At most, a question for the jury was presented. The existence of such a question does not alter the propriety of issuing the challenged instruction.

iv

Finally, Beard asserts that the record did not contain sufficient evidence to warrant issuance of the challenged instruction because Dr. Gala provided testimony elicited by questions framed by counsel that could be construed as her making her treatment decisions in this matter based on a single day of treatment,

61

rather than on the entirety of her treatment relationship with Supak. Beard is mistaken.

As a general matter, a jury is free to consider a question posed to a witness as either unartfully or unfairly phrased and thereby view the answer provided in response to such a question accordingly. The jury herein, for instance, could have chosen to view Dr. Gala's response to the question at issue and consider Dr. Gala's answer in light of her decade of treating Supak, as evidenced by Dr. Gala's testimony, the exhibited medical records, and Dr. Volkmann's testimony summarizing those records.

Moreover, the trial judge, in determining whether sufficient evidence was adduced to warrant issuance of the challenged instruction, was free to recognize the jury's freedom to so consider the question and answer at issue. Thus, Beard's assertions challenging the sufficiency of the evidence to provide the exercise of judgment instruction fail. The trial court did not err by issuing the challenged instruction to the jury.

C

Beard next asserts that the issuance of the exercise of judgment instruction constituted an improper judicial comment on the evidence. Beard's claim is in large part based on his assertion that Dr. Gala did not present substantial evidence that she met the standard of care required to justify the issuance of the challenged instruction. We have addressed that assertion in the preceding section, concluding to the contrary. Given that we concluded that Dr. Gala presented substantial evidence to support issuance of the jury instruction

and because the law was correctly stated in that instruction, the instruction did not constitute an improper judicial comment on the evidence.

1

As previously noted, judges do not comment on the evidence merely by properly instructing a jury on the law. "An instruction which does no more than accurately state the law pertaining to an issue does not constitute an impermissible comment on the evidence by the trial judge under Const. art. 4, § 16." Christensen, 123 Wn.2d at 249 (citing Hamilton, 111 Wn.2d at 571). Whether to give this instruction is within the trial court's discretion. Christensen, 123 Wn.2d at 248.

In Christensen, the plaintiff contended that two instructions—the no guarantee-poor result and the exercise of judgment instructions—should not have been issued on the basis that they were unwarranted and thus constituted a comment on the evidence. 123 Wn.2d at 248. Our Supreme Court held that the trial court did not err by giving the exercise of judgment instruction. More than one defense expert testified to the alternative choices of therapeutic techniques that the defendant physician could reasonably employ to treat the plaintiff's condition. This testimony supported the physician's analysis of the situation and choice of actions. Thus, the instruction was warranted. Christensen, 123 Wn.2d at 249.

Moreover, the exercise of judgment instruction issued to the jury "accurately stated the law as set forth by this court in Watson and thus did not constitute [a] comment[ ] on the evidence." Christensen, 123 Wn.2d at 249.

63

Hence, the trial court was justified in issuing the exercise of judgment jury instruction as a supplement to the standard of care instruction. The same is so herein.

Here, the record demonstrates similar circumstance. Expert medical witnesses, Dr. Volkmann, Dr. Brown, Dr. Curlin, and Dr. Williams, testified to the array of alternative treatments and diagnoses that fit within the standard of care for a patient suffering the same medical conditions as Supak. Dr. Gala also testified to the choices that she made in providing treatment to Supak. Substantial evidence was thus presented to the jury, as the trier of fact, to consider in their deliberations. The trial court then properly issued the exercise of judgment instruction because the instruction did "no more than accurately state the law pertaining to an issue." Christensen, 123 Wn.2d at 249. The instruction in no way conveyed the judge's personal beliefs on the merits of the case. See Addox, 123 Wn.2d at 38. Accordingly, there was no error.

D

Finally, Beard contends that issuing both the no guarantee-poor result and exercise of judgment instructions together was unfair because it overemphasized the defense theory of the case and unnecessarily emphasized the limits of physician liability. Beard argues that four standard of care instructions were given, two of which were neutral,[24] while the other two—no guarantee-poor result and exercise of judgment instructions—were slanted in Dr. Gala's favor. Beard

---

[24] The two "neutral" instructions were jury instruction 7 (which defined the standard of care and negligence in accordance with WPI 105.01) and jury instruction 6 (which set forth plaintiff's burden of proof in accordance with WPI 105.03).

asserts that issuing half of the standard of care instructions in this manner constituted a comment on the evidence and was prejudicial. These assertions are unavailing.

1

"Generally, the reviewing court considers an objection to the exclusion of a specific instruction by examining the instructions as a whole." Vasquez v. Markin, 46 Wn. App. 480, 490, 731 P.2d 510 (1986). "When the instructions as a whole so repetitiously cover a point of law or the application of a rule as to grossly overweigh their total effect on one side and thereby generate an extreme emphasis in favor of one party to the explicit detriment of the other party, it is, we think, error." Samuelson v. Freeman, 75 Wn.2d 894, 897, 454 P.2d 406 (1969).

However, the standard of care instruction, no guarantee-poor result instruction, and exercise of judgment instruction are routinely given together in Washington courts. The note on use to the WPI 105.08 states that when the exercise of judgment instruction is issued, "[t]he court should give WPI 105.07 (No Guarantee—Poor Result) . . . with this instruction."[25] In accordance with this recommendation, the issuance of these two instructions in tandem is routinely upheld on appeal. See Christensen, 123 Wn.2d at 247-49; Watson, 107 Wn.2d at 161-170; Miller, 91 Wn.2d at 159-61; Vasquez, 46 Wn. App. at 487-89.

2

The no guarantee-poor result instruction and exercise of judgment instructions are supplemental to the general and specialist standard of care

---

[25] WPI 105.08, at 625.

instructions. The guidance provided in both WPI 105.07 and WPI 105.08 clearly instruct courts that they "should give" or "use," "when appropriate," "this instruction to supplement either WPI 105.01 (Negligence—General Health Care Provider), or WPI 105.02 (Negligence—Health Care Provider—Specialist)."

Once, again, Watson explains that

> [t]he "no guarantee", "bad result" and "error in judgment" instructions discussed above, to use the phraseology of Miller, "supplement" the standard of care; *while they may clarify it, they do not change it.* Thus, these instructions can only be given in connection with a proper standard of care instruction.

107 Wn.2d at 166-67 (emphasis added);[26] see also Christensen, 123 Wn.2d at 248. These instructions are intended to remind the jury that "medicine is an inexact science." Fergen, 182 Wn.2d at 804 (citing Watson, 107 Wn.2d at 167).

3

It is plain that the legal principles contained in the two challenged instructions have repeatedly been deemed to be the proper subjects of jury instructions. Basing a challenge on the mere number of instructions given is a pointless approach. So long as the supplemental instructions were truly that, and were not repetitive, it matters little whether the legal principles were set forth in one, two, or three supplemental instructions.

We find Beard's reliance on the 1969 decision in Samuelson unavailing. In that case, the Supreme Court held that the trial court's issuance of six consecutive standard of care instructions constituted an "extreme case where

---

[26] In Watson, the "no guarantee" and "bad result" principles were contained in separately issued instructions. Thus, three supplemental instructions were approved of, rather than the two at issue herein.

they overlap and are repetitive to such a degree that a court of review must find them palpably unfair." Samuelson, 75 Wn.2d at 897.

The court then noted that "[t]his overweighing of the instructions is not likely to recur . . . because of the recent publication in this state of [the] Washington Pattern Jury Instructions . . . which set forth possible instructions concerning standards of medical practice and seem to do so with fairness and reasonable brevity." Samuelson, 75 Wn.2d at 897.

The Samuelson court's prediction has apparently borne out. Other than Samuelson, the sole case authority cited to us by Beard that ruled similarly to Samuelson is Brown v. Dahl, 41 Wn. App. 565, 579, 705 P.2d 781 (1985), a 39-year old decision in which the trial court issued five instructions on the standard of care that were "strikingly similar to those held to be unduly overemphasiz[ing] in Samuelson."

The absence of recent authority following Samuelson's holding reinforces our belief that the trial court did not herein err by issuing these two challenged pattern instructions in accordance with the recommendation set forth in the note on use applicable to these very instructions.

The combination of the general standard of care instruction plus the two properly issued supplemental instructions did not constitute an overemphasis in the whole of the jury instructions. The issuance of these instructions did not constitute an improper judicial comment on the evidence and did not deny Beard a fair trial.

Affirmed.

WE CONCUR: